IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

ALL-WAYS LOGISTICS, INC.,        *
                                 *
        Plaintiff,               *
                                 *
                                 *
vs.                              *        No. 3:06cv0087 SWW
                                 *
                                 *
                                 *
                                 *
USA TRUCK, INC. and              *
USA LOGISTICS,                   *
                                 *
        Defendants.              *

<u>MEMORANDUM AND ORDER</u>

All-Ways Logistics, Inc. ("All-Ways"), a provider of freight hauling services, brings this

action against USA Truck, Inc. and USA Logistics, also providers of freight hauling services

(collectively "USA" when not referenced separately), for breach of contract, breach of the

implied covenant of good faith and fair dealing, promissory estoppel, tortious interference with

business relations, and defamation, for alleged actions involving the application and later

termination of a Commission Agreement between All-Ways and USA Truck.  USA, in turn, has

counterclaimed against All-Ways for negligence, breach of fiduciary duty, and breach of agency

contract.

Now before the Court are the following motions: (1) All-Ways' motion to dismiss USA's

counterclaim [doc.#37]; (2) All-Ways' motion for summary judgment on USA's counterclaim

[doc.#39]; (3) All-Way's motion for partial summary judgment in regards to the Rheem account

[doc.#42]; and (4) USA's motion for summary judgment [doc.#46].  Responses and replies to

these motions have been filed and the matter is ripe for determination.[1]  For the reasons that

follow, the Court denies as moot All-Ways' motion to dismiss USA's counterclaim [doc.#37],

denies All-Ways' motion for summary judgment on USA's counterclaim [doc.#39], denies All-

Way's motion for partial summary judgment in regards to the Rheem account [doc.#42], and

denies USA's motion for summary judgment [doc.#46].

I.

All-Ways is a South Carolina corporation, with Cheryl Anderson the sole

incorporator/shareholder, and her husband, Mike Anderson, a consultant to the company,

providing assistance in sales and other areas.   USA Truck is a Delaware corporation with its

principal place of business in Van Buren, Arkansas.  USA Logistics is an unincorporated

division of USA Truck.

Prior to 1999, All-Ways was a commission agent for CCC Express, Inc., another trucking

company located in Fort Smith, Arkansas.  USA Truck purchased CCC Express in 1999, and on

October 26, 1999, All-Ways executed a Commission Agreement with USA Truck which

provided for the payment of a 5% commission to All-Ways for all freight transported by USA

Truck which had been "solicited" by All-Ways.   The Commission Agreement provides:

<u>Commission Agreement</u>

To:     All-Ways Logistics, Inc.

We are pleased that you have agreed to solicit freight on behalf of USA
Truck, Inc. ("USA Truck"), a Delaware corporation.  The Commission

---

[1] Certain corrective pleadings have been filed [doc.#'s 86, 87, 88] to correct not substantive matters but inaccurate citations which apparently resulted from formatting errors that occurred from e-mailed deposition transcripts received from court reporters.  The exhibits filed with these corrective pleadings replace the previously filed exhibits.

Agreement ("Agreement") between you and USA Truck will be governed by the following terms and conditions:

1.      You do not have the authority to bind USA Truck to a contract with any shipper for the transportation of freight.  If freight is accepted by USA Truck, a tariff will be provided to you and you will be paid a commission, as discussed in paragraph 4.

2.      You will be an independent contractor with control over the manner, means and method of freight solicitation.  All of your employees, if any, will be subject only to your control.  You will provide workers' compensation insurance on all of your employees and will be solely responsible for all employment taxes and withholding taxes due to federal, state, local or foreign governments on your own account and on account of any workers or other employees necessary for the performance of your obligations under the terms of this Agreement.  You agree to indemnify and hold USA Truck harmless from and against any and all claims, demands, losses or actions brought or asserted against USA Truck by any of your employees or by any federal, state, local or foreign government agency on account of wages or any other actions arising from your relationship with any of your employees.  You and your employees will not be employees of USA Truck at any time, under any circumstances, for any purpose.  You will pay all expenses incurred in connection with your services to USA Truck, including expenses for telephone, travel, office supplies, personnel, automobile, meals, lodging and insurance.

3.      CARRIER shall be liable for all loss, damage or liability occasioned by transportation of property arranged by agent while being transported by CARRIER under rules contained in 49 USC.

4.      USA Truck agrees to pay you a  Five (5) %  commission weekly for all services provided by you to USA Truck under this Agreement.  The commission shall be for the linehaul tariff charge due USA Truck on all freight solicited by you and transported by USA Truck, up to the date this Agreement is cancelled, less any revenue for accessorial, detention, redelivery, consolidation handling charges, or other similar charges.  USA Truck will exercise good faith in deciding all questions concerning your right to payment of a commission and the amount of any commission payable under this agreement.

5.      CARRIER will be responsible for invoicing all accounts.  CARRIER has the right to determine that customer meets all credit and payment standards of CARRIER.

6.      This agreement shall remain in effect unless cancelled by either party by 30 days' written notice by certified mail.  The notice of cancellation will state the

3

effective date of cancellation and will be deemed received on the date appearing on the return receipt.  After the effective date of cancellation, it will be conclusively presumed that no freight transported by USA Truck was solicited by you and no commission will be due on freight transported after the effective date of cancellation.

7.      The foregoing Agreement is our entire agreement and understanding between the parties with respect to the subject matter hereof, and may be modified, altered, changed or amended only by a written instrument executed by both you and USA Truck.  Your authority is limited expressly to the rights and duties set out herein.  This agreement shall be governed by the laws of the state of Arkansas.

8.      This Agreement may not be assigned or otherwise transferred or delegated by operation of law or otherwise, in whole or in part, without the prior written consent of the parties hereto.

When All-Ways signed on as a commission agent for USA Truck in 1999, All-Ways brought with it certain accounts, including Rheem Manufacturing Company ("Rheem"), a manufacturer of air conditioning products based in Fort Smith, Arkansas, and W.W. Grainger ("Grainger"), a domestic and international business-to-business distributor.[2]  Over the next few years, the parties operated under the Commission Agreement apparently without issue.

### a. Rheem Account

In March 2002, Rheem changed the way it was handling its transportation needs by hiring a logistics provider.  Prior to March 2002, Rheem handled shipping in-house using its own personnel and shipping managers.  Because Rheem had no trucking fleet, Rheem personnel

---

[2] Prior to contracting with All-Ways, USA Truck had done no business with Grainger, and had done little business with Rheem. Although USA Truck states it was already an approved carrier for Rheem, there appears to be no real dispute that the Rheem business that is the subject of this action flowed from the Rheem business brought by All-Ways when it signed on as a commission agent for USA Truck.  In this respect, Jack Morgan, Director of Sales at USA Truck, stated that previously, Rheem, which was a customer of USA Truck "on a very small scale," had offered USA Truck undesirable "multi-stop loads" but that after All-Ways came into the picture, USA Truck's Rheem business increased and USA Truck began getting the type of loads that USA Truck wanted.

would select one of about 20 different carriers it regularly used, tender the loads directly to a carrier, schedule pickup and delivery of the freight load with the carriers, monitor delivery, and deal with any customer complaints regarding that shipment.  If the carrier used an agent, then Rheem would deal directly with the carrier's agent.  In 2001, Rheem decided to abandon this system of dealing directly with carriers or their agents by outsourcing all shipping decisions to a logistics company.  Rheem conducted a study of the manner in which it was handling its transportation needs, which determined it was lacking a good logistics planning system and process, and therefore opted to partner with a third-party logistics firm rather than develop that expertise internally.  Rheem wanted the new logistics company to be directly responsible for selecting carriers for Rheem loads, scheduling pickups and deliveries with all the various carriers, overnight of delivery, and dealing with customer issues regarding carrier deliveries. Under Rheem's new shipping model, Rheem had no dealings with carriers or agents representing carriers.  The logistics company would be the one source of contact between the carriers shipping Rheem's loads and Rheem's customers.

In late 2001, Rheem entertained bids from the following logistics companies: C.H. Robinson, Transplace, Tompkin Associates, National Freight, and Nationwide.  USA Logistics was not in the original group of logistics providers from whom Rheem requested bids.  USA Logistics states it first learned about Rheem's desire to hire a third party logistics company when Mike Peterson at USA Logistics called upon Roger Taylor at Rheem about another matter.  USA Logistics states that Taylor, who had known Peterson since 7th grade, informed him Rheem was

looking for a logistics company to handle all of Rheem's shipping needs.[3]

After Roger Taylor of Rheem first talked to Mike Peterson at USA Logistics, Taylor asked his boss at Rheem, Bob Martin, whether USA Logistics could also be included in the bidding process to become Rheem's third-party logistics provider.  Approval was apparently granted and in the fall of 2001, USA Logistics bid to become the Rheem third-party logistics provider along with numerous other logistics companies.  Rheem accepted USA Logistics' bid and Rheem issued a news release announcing the new freight management partnership between Rheem and USA Logistics.

Rheem states it did not consider All-Ways for the logistics provider position because All-Ways did not have the personnel, technology, or expertise for the position.   All-Ways denies this, stating that Rheem did not consider it for the logistics provider position because All-Ways did not apply for the logistics provider position.  All-Ways states it was not in the same business as USA Logistics as All-Ways is a commission agent for motor freight carriers while USA Logistics is a logistic provider for shippers.[4]

In March 2002, USA Logistics began its duties as Rheem's logistics company and Rheem notified all carriers by letter dated March 12, 2002, that USA Logistics was being hired

---

[3] All-Ways acknowledges that Mike Peterson called upon Roger Taylor at Rheem and that Taylor and Peterson had known each other in school.  All-Ways states, however, that Greg Goodner of USA Logistics knew of Peterson's and Taylor's acquaintance from school and encouraged Peterson to make a sales call on Taylor, and as a result of these sales calls, USA Logistics was permitted to bid for the position of logistics provider for Rheem.  In other words, according to All-Ways, it was not, as claimed by USA, "[b]y happenstance [that] USA Logistics, an unincorporated division of USA Truck, found out that Rheem was making this change and was seeking bids for a logistics company."  Rheem also states it had already decided to hire a logistics provider before USA Logistics even found out Rheem was entertaining bids for a third party logistics provider.  All-Ways denies this, stating there is conflicting testimony about exactly when USA Logistics first learned that Rheem was entertaining bids for a third party logistics provider.

[4] Roger Taylor of Rheem noted that although All-Ways and USA Logistics are "both called logistics, ... they're separate functions that they provide," with All-Ways being a commissioned agent for a carrier while USA Logistics' function was to get manufactured goods from one point to another by hiring carriers to do that.

to handle the logistics transportation needs for Rheem.  In that context, USA Logistics was responsible for selecting carriers for Rheem freight, scheduling pickup and deliveries of hundreds of loads weekly, overseeing those shipments, and acting as the sole liaison between Rheem's shipping customers and the various carriers.

After USA Logistics was hired to be the third-party logistics provider for Rheem, USA Truck, effective April 5, 2002, ceased paying any commissions to All-Ways on the Rheem account.  Jack Morgan at USA Truck told Mike Anderson at All-Ways on the telephone that USA intended to suspend payments to All-Ways on Rheem freight hauled after March 2002.  Anderson protested to no avail and payments ceased, although the Commission Agreement was not cancelled.

USA Truck states that All-Ways has not solicited any "specific loads" from Rheem which were tendered to and accepted by USA Truck as required by the Commission Agreement since March 2002.  All-Ways does not dispute that particular statement, but states that it never solicited "specific loads" from Rheem because the Rheem "book of business" was solicited prior to execution of the Commission Agreement.  Mike and Cheryl Anderson at All-Ways claim that All-Ways had no duties or responsibilities under the Commission Agreement other than to bring potential customers to USA Truck, and that if USA Truck decided to haul freight for one of those customers, then USA Truck would enter into a written contract directly with that customer setting out the agreement between them.  Once USA Truck had made an agreement with the customer, state the Andersons, All-Ways would be paid a commission for having brought that customer to USA Truck.  Mike Anderson states All-Ways was to be paid for "[e]verything that was [hauled] by USA Truck for the account of Rheem," and that "[i]f it was hauled, any of those

accounts that we brought into the contract in '99, All-Ways Logistics got paid for them.  That's how it was set up."  In this regard, All-Ways claims that USA Truck paid the specified 5% commission on all freight it hauled for Rheem from October 26, 1999, through April 4, 2002, having initially brought or solicited the Rheem "book of business" to USA Truck.  USA Truck, however, claims it only paid All-Ways for all individual Rheem freight specifically solicited by it and hauled by USA Truck during that time period and that All-Ways was required to actively solicit individual freight loads from shippers and tender those loads to USA Truck for transport before USA paid a commission on that load.

USA Logistics did not assign all freight shipments to USA Truck.  USA Logistics states it chose carriers for hauling freight to a particular destination based on several factors including the carrier's experience hauling that lane (a route between two points) and the price for hauling that lane.[5]  USA Truck states it carried about 20% of Rheem's freight after USA Logistics took over Rheem's shipping operations.  All-Ways, however, states the testimony is conflicting as to how the decision was made to tender freight to USA Truck rather than other carriers and as to the percentage of Rheem's freight that was carried by USA Truck.  All-Ways points to the testimony of Mike Peterson of USA Logistics that USA Logistics first turned to USA Truck to see if USA Truck could or wanted to haul Rheem's freight; that the plan was for USA Logistics to get the load information from Rheem, put it into the software, and then pick a carrier based on rate to pull it; that "[t]hey didn't follow that plan probably 50 percent of the time"; that Rheem's shipping department was "very fond of putting it on a USA Truck"; and that "the plan was for us

---

[5] Michael Peterson of USA Logistics explained that if we can go out and find another carrier to haul the freight at a cheaper rate, "[a]nd when you're talking about the volume that Rheem shipped out, that's a lot of money" that we make.

to determine who was the best priced carrier to pull that load, but that didn't always happen."[6]

After commission payments were stopped on the Rheem account, USA Truck continued to pay commissions to All-Ways pursuant to the Commission Agreement on the Grainger account and other various accounts for all freight solicited by All-Ways until USA Truck gave notice to All-Ways it was cancelling the Commission Agreement.  All-Ways never made any complaint in writing to USA Truck regarding the cessation of Rheem freight related commissions until it filed its original complaint in May 2006, but states that it was not required to make complaints in writing in order for them to be valid complaints and that it made multiple complaints to multiple employees of USA Truck that USA Truck was not honoring the Commission Agreement and that USA Truck's treatment of All-Ways was not right.

b. Grainger Account

In 2005 Janet Kemp, Transportation Manager at Grainger, requested Brad Booth at Transplace (Granger's logistics company) to ask USA Truck to consider the manner in which All-Ways served as an agent on USA Truck's shipping account with Grainger.[7]  Prior to 2005, Kemp was not aware that All-Ways/Mike Anderson was handling all of these operational issues for USA Truck.  While "not ask[ing] USA to fire Mike [Anderson] or make him go away from

---

[6] Nevertheless, the parties seemingly agree that during the period April 5, 2002, through October 6, 2005, USA Logistics was paid a total of $59,337,605.61 in linehaul tariff charges for transporting Rheem's freight – $11,821,981.31 of which was transported on USA Truck's own equipment, and $47,515,624.30 on trucks provided by other carriers.

[7] Between 2002 and 2005, All-Ways received over 1.5 million dollars on the Grainger account alone, with $376,814.86 being paid in 2002, $486,068.30 being paid in 2003, $604,843.04 being paid in 2004, and $441,291.87 being paid in 2005.  All-Ways received a greater amount of commissions on the Grainger account in 2002 alone that it did from total commissions on the Rheem account from years 1999-2002 combined.  Likewise, the relationship between USA Truck and Grainger was a major source of revenue for USA Truck.  Between 1999 and 2005, Grainger paid USA Truck in excess of 50 million dollars for transportation service.

the USA Truck Company" or cancel his contract with USA Truck, Kemp testified that Grainger wanted to deal with USA Truck directly and have All-Ways Logistics/Mike Anderson "taken out of the middle" from dealing with Transplace and Grainger on the Grainger account.  Kemp testified that part of the issue had to do with manual versus electronic handling of the loads in that "it was an inefficient way that loads were being tendered and they weren't getting updated as quickly as they should be ... than if it was just an electronic connection."  She additionally testified they "were more comfortable knowing all the people within the operation as opposed to having a go-between, less confusion in passing information back and forth ..."  Kemp also testified that part of the issue was Anderson "contacting the Transportation Coordinators and bugging them, so to speak for loads ... [c]ontacting them on a regular basis and kind of being a pest to look for extra loads."  Andy Trout, the Grainger Account Manager for Transplace, stated he had at least two phone conversations with Mike Anderson in which he told Anderson that if he had complaints about the amount of freight he was getting or other issues concerning the account to contact either him or Brad Booth instead of calling the individual Transportation Coordinators to complain and that "there is no validation of not being professional or not being courteous."

On June 27, 2005, Brad Booth at Transplace sent an e-mail to USA Truck asking that it consider removing All-Ways from USA Truck's account with Grainger and promised USA Truck it would not lose any Grainger business if USA Truck removed Anderson.  Following this communication, USA Truck, by letter dated August 29, 2005, cancelled the entire Commission Agreement with All-Ways.  The letter, sent via certified mail, return receipt requested, provides:

> Please accept this letter as notice that USA Truck, Inc. is hereby canceling its Commission Agreement (hereinafter, the "Agreement") with All-Ways Logistics,

Inc., pursuant to paragraph 6 of the Agreement.  The effective date of the cancellation will be Friday, September 30th, 2005, or thirty (30) days after the date this letter is received by you as reflected on the return receipt card, whichever date is later (hereinafter "the Cancellation Date").

USA Truck, Inc. will continue to pay your commission pursuant to the Agreement up to the Cancellation Date.  However, as stated in the Agreement, after the Cancellation Date, it will be conclusively presumed that no freight transported by USA Truck, Inc. was solicited by you, and no commission will be due on freight transported after the effective date of the cancellation.

All-Ways states that it received notice of cancellation on September 6, 2005, making the effective date of cancellation October 6, 2005.[8]

USA Truck states that at no point prior to Kemp's request that All-Ways be removed as the agent on the Grainger account did USA Truck ever request that Grainger and USA Truck deal directly without the services of All-Ways as the agent.  All-Ways denies this, stating that testimony and e-mails produced by the parties reflect that USA Truck was secretly negotiating with Transplace about USA Truck terminating All-Ways as an agent as early as December 2004. All-Ways notes that Burton Weis at USA Truck testified there was an agreement between Brad Booth at Transplace and Brandon Cox at USA Truck to keep this secret from Mike Anderson and All-Ways and "keep All-Ways out of the loop."  Cox, in turn, acknowledged that he never informed Mike Anderson of complaints about his services or attitude, and never informed him that USA was having conversations with Grainger and its representatives about going around All-Ways and cancelling their contract and contracting directly with Grainger.  In a memo to Cox, Weis noted that he asked Booth "if the Grainger business would be there for USA Truck without Mike [Anderson]."  Janet Kemp at Grainger questioned in an e-mail to Booth whether

---

[8] After USA Truck cancelled the Commission Agreement, All-Ways continued to solicit freight from Grainger for Paschal Truck Lines – another carrier – during the year 2005 while the Commission Agreement with USA Truck was in place and continued to do so after USA Truck cancelled their Commission Agreement with All-Ways.

USA has their own sales staff or do they always use independent reps, would they be receptive to working together directly, and "[c]ould it possibly result in a rate decrease since they would not have to pay commission?"

USA Truck states it cancelled the Commission Agreement with All-Ways because of Grainger and Transplace's complaints about All-Ways to insure that it would maintain its business relationship with Grainger.  All-Ways denies this, stating that Grainger's complaints were with USA Truck's poor service, which had nothing to do with All-Ways[9]; that Transplace's complaints were due to All-Ways' assertive solicitation of freight from Grainger, which directly benefitted USA Truck; and that USA Truck could have honored the Commission Agreement and still worked directly with Grainger/Transplace from an operational standpoint.

c. USA's Counterclaim

USA Truck claims that after All-Ways became USA Truck's commission agent on the Grainger account, All-Ways was solely responsible for communicating with Grainger about USA Truck's transportation services and that it was the responsibility of All-Ways to insure that the rates charged by USA Truck to Grainger for hauling freight were properly submitted to and accepted by Grainger.[10]  In this respect, USA Truck states that in September 2004, it decided to

---

[9] Brad Booth at Transplace testified that the level of performance at USA Truck "was not stellar, not poor."

[10] Jack Morgan at USA Truck agreed that Mike Anderson and All-Ways were involved as the middle person in dealing with rates with the customers and that if USA Truck was submitting or negotiating rates, he (Morgan), as a sales person, would send those rates to Anderson and that Anderson would then send them to the customer, and back and forth in that manner. Morgan stated he relied on Anderson to obtain from the customer the approval of the rates that were being submitted by USA Truck and to communicate with the customer about those rates, and then communicate back to him at USA Truck that either the rates had been approved or had been rejected.  Brandon Cox at USA Truck likewise testified that the responsibility to get the rates approved lay on Mike Anderson and that "[h]e's always handled the account previously."  Janet Kemp at Grainger testified that Mike Anderson was at the time the only contact she knew for USA and that she relied on Anderson to convey the rates to USA Truck.

seek a rate increase from Grainger, which USA Truck wanted to be effective by October 2004.

USA Truck states that it e-mailed those rates to Cheryl Anderson at All-Ways, Brad Booth at

Transplace, and Janet Kemp at Grainger, and that in late September, it asked All-Ways if the

rates had been submitted and where the matter stood regarding Grainger's approval.  On October

4, 2004, Cheryl Anderson at All-Ways sent an e-mail to Brad Booth at Transplace seeking

confirmation that the new rates would be effective that same day, October 4, 2004.  Patsy

Campbell at USA Truck was carbon copied on the e-mail.  Patsy Campbell then sent an e-mail to

Cheryl Anderson asking her to notify USA Truck when Grainger confirmed the rates.  The

following day, Mike Anderson at All-Ways sent an e-mail to Patsy Campbell at USA Truck

telling her to make the rates effective as of October 4, 2004, and that a signed copy would

follow.  USA Truck states it began charging Grainger those new increased rates on freight

shipped for Grainger after October 4, 2004.

USA Truck states that when All-Ways sent the rates it received from Janet Kemp at

Grainger back to USA truck, USA Truck noticed that the minimum charge per mile listed was

incorrect, but did not realize that other charges for the more than 8,000 different rates for various

lanes of shipping were different than those contained in its September 2004 rate bid.  USA Truck

states Grainger was paying all the new increased rates.  USA Truck states that its own Susan

Grizzle asked All-Ways to get a signed copy of rate sheets reflecting the correct minimum

charge from Grainger.  USA Truck states that on November 17, 2004, Mike Anderson at All-

Ways sent an e-mail to Brad Booth at Transplace about getting a signed copy of the rate bid with

the correct minimum charges.  When, according to USA Truck, Booth responded to Anderson

that he did not have a copy of the minimum charges, Anderson replied by e-mail that those

charges were included in the rate bid file sent to Booth.  USA Truck states that Booth e-mailed Kemp about getting the rates approved and that Booth told Kemp that USA Truck put in new rates in October but never received the signature sheets for the minimum charges.  USA Truck states that Kemp asked her secretary to print out the new rates, stamp the rates with her signature, and return the original to Mike Anderson, and that Kemp relied on Mike Anderson to convey those rates to USA Truck.   Mike Anderson and All-Ways never provided USA Truck with a copy of those signed rates, states USA Truck.

USA Truck states that based on All-Ways' confirmation to USA Truck that the new rates had been approved, USA Truck began charging Grainger the new October 4, 2004 rates until September 2005.  USA Truck states that Grainger subsequently asserted it did not have a signed copy of the new rates, had never approved those rates, and made an overcharge claim against USA Truck in excess of $700,000, which USA Truck and Grainger settled.  USA Truck states it paid All-Ways a 5% commission on all Grainger freight solicited from October 4, 2004, until August 29, 2005, as calculated using USA Truck's new higher rates it was charging Grainger.

All-Ways disputes USA Truck's characterization of the manner in which new rates were approved.  All-Ways notes that on March 30, 2004, Grainger and USA Truck executed a "Transportation Agreement" between themselves that sets out USA Truck's rights and duties as a freight carrier for Grainger and that All-Ways was not a party to the Transportation Agreement. All-Ways states that in the fall of 2004, USA Truck wanted to implement new rates on the Grainger account and that Richard Boone, Director of Pricing at USA Truck, e-mailed the new rates to Janet Kemp at Grainger and to Brad Booth at Transplace with a copy to All-Ways.  All-Ways states that USA Truck implemented the new rates in October 2004 without having

14

received written approval as required by paragraph 6 of the Transportation Agreement, which provides that "[a]ny modification to the rates ... will require written approval by Grainger in order to be effective," and that USA Truck knew as early as October 2004 that it had not received Grainger's written approval of the new rates.  All-Ways states that USA Truck nevertheless continued to bill and collect under the new rates until September 2005 when Grainger discovered it had never approved the new rates and made a claim for overcharges.[11] All-Ways states it never agreed in writing, orally, or otherwise to be responsible for communicating USA Truck's rates to its shipping customers and/or to obtain the customer's approval of rates.[12]

## II.

All-Ways moves to dismiss USA's counterclaim on the following grounds: (1) negligent breach of contract is not a tort under Arkansas law; (2) no facts are pled that would establish a fiduciary relationship under Arkansas law; and (3) USA has failed to plead sufficient facts upon which to find All-Ways had a duty to "secure approval for the new rates."  All-Ways also moves for summary judgment on USA's counterclaim, stating that it incorporates the arguments made

---

[11] Richard Boone at USA Truck testified that he knew or should have known that as of October 7, 2004, he didn't have a signed copy of the rates and that Janet Kemp at Grainger knew or should have known at some point shortly after that that she hadn't received a signed copy of the new rates.  Boone testified that "the rates were agreed to in October '04, and Janet actually stamped the stamp and sent them to us in July.  So for a six or seven-month time period, we had a verbal okay that these rates were effective," and "then seven months later the document shows up."  "In the meantime," testified Boone, the customer is paying the correct amount as they are supposed to do.  And so it was not a, it didn't seem to be that big of an issue, and it later ultimately did become a big issue."

[12] Mike Anderson at All-Ways states that because he and All-Ways "deal very closely with each of our customers, we tried to stay informed and act as the 'middle man' between our customers and USA Truck; but USA Truck sometimes communicated directly with our customers on routine maters."  Anderson states that "[w]hen we were asked to do so, All-Ways helped in the process of sending rates back and forth between the customer and USA Truck, but it was never our responsibility to do so."

in support of the motion for dismissal of the counterclaim and asks this Court to consider the additional arguments in the motion for summary judgment and matters outside the pleadings presented therein.  As matters outside the pleadings will be considered, this Court will deny as moot All-Ways' motion to dismiss USA's counterclaim and will instead consider All-Ways' motion to dismiss in the context of its motion for summary judgment on USA's counterclaim. All-Ways additionally moves for partial summary judgment in regards to the Rheem account, stating it is entitled to its commission on all freight USA Truck hauled for Rheem from April 5, 2002 (the date USA Truck ceased paying commission to All-Ways on the Rheem account) through October 6, 2005 (the effective date of the cancellation of the Commission Agreement), with said commission totaling $2,966,880.28 (representing 5% of the $59,337,605.61 USA Logistics was paid for transporting Rheem's freight during this period).

USA, in turn, moves for summary judgment on All-Ways' entire cause of action on the following grounds: (1) All-Ways' breach of contract claim regarding the Rheem account fails because Rheem's changed shipping practices frustrated the purpose of the Commission Agreement suspending USA Truck's obligation to pay for post-March 2002 Rheem loads and All-Ways in any case waived any alleged breach of the Rheem account by continuing to accept benefits under the Commission Agreement for more than three years after that alleged breach; (2) All-Ways' breach of contract claim as to the Grainger account fails as a matter of law because USA Truck had the right to cancel the Commission Agreement; (3) All-Ways' tortious interference with a business expectancy claim relating to the Grainger account fails as a matter of law because All-Ways had no business expectancy, the undisputed facts show USA Truck committed no intentional interference, USA Truck's alleged motive does not support a tortious

interference claim because it was not improper, and USA Truck's actions vis-a-vis Grainger were privileged; (4) All-Ways' promissory estoppel claim regarding the Grainger account fails as a matter of law because even assuming USA Truck promised not to "back-solicit" Grainger, the undisputed facts show that Grainger wanted to deal directly with USA Truck and asked for All-Ways to be removed as the agent on the Grainger account; (5) All-Ways' breach of implied duty of good faith as to the Rheem and Grainger accounts fails because Arkansas does not recognize a separate cause of action for breach of that duty; and (6) All-Ways cannot support a claim for punitive damages.[13]

## A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue*

---

[13] All-Ways states it is withdrawing its claims of tortious interference and promissory estoppel as to the Rheem account, and is withdrawing its defamation claim as to the Grainger account. Accordingly, those claims are no longer at issue and have not been referenced in the recitation of the grounds upon which USA is moving for summary judgment.

*for trial.*'"   *Id.* at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis).   *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).   The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.   *Matsushita,* 475 U.S. at 587 (citations omitted).   However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"   *Id.* (citation omitted).


## B.

As a threshold matter, this Court must address the meaning to be afforded Paragraph 4 of the Commission Agreement as resolution of many of the claims upon which summary judgment is sought depend on that meaning.   USA agrees that Paragraph 4 of the Commission Agreement must be the primary focus of the Court since it contains the parties' objective manifestations of their agreement regarding payment of commissions.   USA acknowledges that "[o]bviously, the parties dispute the meaning of Paragraph 4."   All-Ways likewise states that the meaning of the Commission Agreement is integral to its claims of breach of contract for non-payment and back-solicitation, breach of the express promise to "exercise good faith" and the implied covenant of good faith and fair dealing (claims and issues that are common to both the Rheem and Grainger accounts), and promissory estoppel regarding the promise not to back solicit All-Ways' shipper accounts and tortious interference with the Grainger account.   All-Ways argues that "[p]roper characterization of the Commission Agreement and analysis of each parties' duties under it is critical to understanding why two of USA's principal arguments for summary judgment – the doctrines of frustration of purpose and waiver by acceptance of benefits – have no application to

these facts."

1.

Under Arkansas law, the court ascertains the plain and ordinary meaning of a contract. *Southern Implement Co., Inc. v. Deere & Co.*, 122 F.3d 503, 506 (8th Cir. 1997) (citation omitted). The initial determination whether a contract is ambiguous is a legal determination for the court. *Id.* The language contained in the contract is the best evidence of the parties' intentions. *Lion Oil Co., Inc. v. Tosco Corp.*, 90 F.3d 268, 270 (8th Cir. 1996) (citation omitted). Thus, the court looks first to the contract itself to determine if it is ambiguous – not to extrinsic evidence offered to contradict the plain meaning of the contract. *Id.* When a contract is unambiguous, the court determines its meaning as a matter of law. *Southern Implement*, 122 F.3d at 506 (citation omitted). Where there is ambiguity in a contract, the meaning of the terms of the contract becomes a question of fact, and extrinsic evidence of the meaning of a contract is admissible. *H & H Brokerage, Inc. v. Vanliner Ins. Co.*, 168 F.3d 1124, 1127 (8th Cir. 1999) (citations omitted). *See also First National Bank of Crossett v. Griffin*, 310 Ark. 164, 832 S.W.2d 816 (1992) ("The initial determination of the existence of ambiguity rests with the court and, if the writing contains a term which is ambiguous, parol evidence is admissible and the meaning of the ambiguous term becomes a question of fact for the factfinder").

2.

As previously noted, Paragraph 4 of the Commission Agreement provides as follows:

USA Truck agrees to pay you a  Five (5) %  commission weekly for all services provided by you to USA Truck under this Agreement. The commission shall be

19

for the linehaul tariff charge due USA Truck on all freight solicited by you and transported by USA Truck, up to the date this Agreement is cancelled, less any revenue for accessorial, detention, redelivery, consolidation handling charges, or other similar charges.  USA Truck will exercise good faith in deciding all questions concerning your right to payment of a commission and the amount of any commission payable under this agreement.

This Court has carefully considered the matter and finds that the Commission Agreement is ambiguous.  Concerning the term "all freight solicited by you," Paragraph 4 may be read to require, as claimed by USA, that All-Ways actively solicit individual freight loads from shippers and tender those loads to USA Truck for transport before USA Truck must pay a commission on that load.  Alternatively, Paragraph 4 may be read, as claimed by All-Ways, to refer to all freight transported for any shipper whose account or "book of business" was brought, *i.e.*, solicited, to USA Truck by All-Ways and that All-Ways was thus to be paid its commission on all freight transported for that shipper.  USA claims the parties operated under the former interpretation of Paragraph 4 while All-Ways claims the parties operated under the latter interpretation.

All-Ways point to certain extrinsic evidence concerning its characterization of the Commission Agreement.  Among other things, Patrick Majors, Vice-President of Sales at USA Truck and who signed the Commission Agreement for USA Truck, testified that it was the practice at USA Truck to pay commissioned agents a commission on all freight that they hauled for a customer brought to USA Truck by that agent as long as the Commission Agreement was in place and that "all that happens" with a commission agent is that they bring a book of business to the company and the company that's representing the agent hauls the freight and then pays the commission agent his commission on that business that is hauled.  Majors affirmed that the commission agent does not have any other duties or responsibilities other than just bringing the book of business – the relationship with the customer – to USA Truck: "they bring the business

20

and then operationally we do the rest" – their job "was to bring the customer in and make the introduction and then if the shoe fit, the carrier would wear it and carry the freight and pay the agent."  Similarly, Jack Morgan of USA Truck, who drafted the Commission Agreement and presented it to All-Ways for signature,[14] testified that Mike Anderson of All-Ways brought with him different Rheem business than USA Truck previously was doing and that the Rheem account was assigned to All-Ways and it was agreed that USA Truck "was going to pay him for this" because "[t]hat's business that we can't touch."

USA disputes, somewhat unconvincingly, the strength of All-Ways' extrinsic evidence stating, among other things, that Majors is an ex-employee of USA Truck, did not draft the Commission Agreement, did not directly interact with All-Ways, and could not recall how the Commission Agreement came about.   USA argues that Majors has reason for bias and no personal knowledge about the formation of the Commission Agreement or the parties' intent at formation.  Concerning Morgan, USA argues that his testimony on this point has nothing to do with interpretation of the word "solicitation" but concerns whether any specific fees incidental to shipping were excluded under the Commission Agreement.

There is also a question attendant to Paragraph 4 concerning the phrase "transported by USA Truck."  USA acknowledges that USA Logistics was at all times pertinent to this case a division of USA Truck but argues that USA Logistics and USA Truck "were treated as separate entities vis-a-vis the Rheem account by USA Truck and Rheem."  While acknowledging that Rheem paid USA Logistics $59,337,605.61, in linehaul tariffs between 2002 and 2005, USA

---

[14] Morgan testified he had accumulated a file of standard contracts over the years and that he would pick out paragraphs that were acceptable to him, as a representative of USA Truck, and then negotiate the terms in those contracts with the agents that came from CCC Express, including All-Ways and Mike Anderson.  Morgan testified that the varying contracts USA Truck signed with the different agents that came from CCC Express would have varying terms and that he did not have any lawyers review the contracts before they were submitted as "you don't have to be a lawyer to understand it."

states that USA Logistics "was merely a pass-through entity," that "USA Logistics would select a carrier and pay them that tariff for physically hauling Rheem's freight," and that "[a]s a fee for its logistic services, USA Logistics simply kept the difference between the tariff Rheem paid it and the tariff rate it negotiated with the actual carrier who transported the freight."[15]  Dwain Key of USA Logistics testified that USA Logistics was paid by Rheem pursuant to agreed upon rates and that USA Logistics would then turn around and parcel out the freight and pay that carrier, including USA Truck, that carried the freight.

All-Ways, however, argues that the Commission Agreement makes no such distinction, that USA Logistics and USA Truck are the same entity, and that USA Logistics contracted with Rheem to transport all of Rheem's freight and was paid the "linehaul tariff" for providing that service, all the while USA Truck's Commission Agreement with All-Ways was in place.  Mike Anderson at All-Ways testified that he didn't have a problem with Rheem using USA as a Logistics provider because one of the shippers All-Ways brought to the table was Rheem and "if it was hauled on a USA Truck or if it was brokered out from USA Truck or tendered to USA Logistics, we were entitled to our 5 percent" commission on the $59,337,605.61 total sum received by USA Logistics from Rheem in "linehaul tariff" charges during the period April 5, 2002, through October 6, 2005.

## C.

Having determined that the Commission Agreement is ambiguous the Court now turns to the claims upon which summary judgment is sought.  In addressing these claims, it must be

---

[15] In other words, argues USA, freight managed by USA Logistics is not freight hauled by USA Truck.  As previously noted, USA Logistics sought outside carriers charging cheaper rates "[b]ecause that's where you make your money."

noted that where the parties go beyond the contract and submit disputed extrinsic evidence to support their proffered definitions of ambiguous terms, this is a question of fact of the jury and summary judgment in such situations is not proper. *Elam v. First Unum Life Ins. Co.*, 346 Ark. 291, 297, 57 S.W.3d 165, 170 (2001). Considering the disputed extrinsic evidence referenced previously, this Court finds that summary judgment is not proper.

### 1.

USA first argues that All-Ways' breach of contract claim regarding the Rheem account fails because Rheem's changed shipping practices frustrated the purpose of the Commission Agreement by suspending USA Truck's obligation to pay for post-March 2002 Rheem loads. USA additionally argues that All-Ways in any case waived any alleged breach of the Rheem account by continuing to accept benefits under the Commission Agreement for more than three years after that alleged breach.

USA's argument concerning the doctrine of frustration depends on the meaning to be afforded the Commission Agreement.[16] USA states Rheem's change in the manner it was handling its freight hauling needs in March 2002 rendered All-Ways' alleged contacts at Rheem useless for solicitation purposes, but USA Truck did not cancel the Commission Agreement until August 29, 2005 (with an effective date thirty days following receipt of notice of cancellation), and a finder of fact accepting All-Ways' meaning of the Commission Agreement could determine that All-Ways was to be paid a commission on all Rheem freight tendered to USA

---

[16] Pursuant to the doctrine of frustration, performance remains possible but is excused whenever an event not due to the fault of either party supervenes to cause a destruction of the expected value of performance. *Pete Smith Company, Inc. v. City of El Dorado*, 258 Ark. 862, 863, 529 S.W.2d 147, 148 (1976).

Logistics and transported for Rheem – regardless of the specific carrier used – while the Commission Agreement was in place, despite any change in the manner Rheem handled its freight hauling needs.[17]

USA's argument concerning waiver by acceptance likewise depends upon the meaning to be afforded the Commission Agreement.[18]  USA states that All-Ways knew of the alleged breach of the Commission Agreement related to the Rheem account in March 2002 but nevertheless continued to accept commissions on other accounts without declaring a breach of the Commission Agreement.  Because the Commission Agreement is a bilateral contract, argues USA, waiver by acceptance bars All-Ways' breach claim.[19]  All-Ways, however, argues that each "book of business" gave rise to a separate and independent unilateral contract between the parties and that All-Ways' performance as to one account did not entitle it to a commission on another, nor did USA Truck's breach by nonpayment as to one account create a cause of action for breach as to the others.  Again, these competing views depend on the meaning to be afforded

---

[17] Moreover, states All-Ways, "USA is not without fault – by failing to disclose its ongoing negotiation with Rheem over several months, USA breached its duty to act in good faith and deal fairly with All-Ways; and by refusing to deal with All-Ways in any manner on the Rheem account after USA became Rheem's logistics provider, USA itself rendered All-Ways further performance impossible, even as to the percentage of Rheem's freight that USA Truck continued to transport with its own equipment – freight it had never been able to garner by its own efforts and which All-Ways delivered."

[18] The rule as stated by the Supreme Court of Arkansas, is that "one party to a contract who, with knowledge of a breach by the other party, continues to accept benefits under the contract, and suffers the other party to continue in performance thereof, waives the right to insist on the breach."  *Jet Asphalt & Rock Co., Inc. v. Angelo Iafrate Const.*, 431 F.3d 613, 617-18 (8th Cir. 2005) (quoting *Southern Pipe Coating Inc. v. Spear & Wood Mfg. Co.*, 235 Ark. 1021, 363 S.W.2d 912, 914 (1963)).

[19] USA characterizes the Commission Agreement as a bilateral contract while All-Ways characterizes the Commission Agreement as a unilateral contract.  Bilateral contracts require a promise to be made in order to form a contract while unilateral contracts require an act.  Richard A. Lord, 1 *Williston on Contracts* § 6.2 (4th ed. West 2006).  Stated differently, a bilateral contract is found where each party promises some performance, while a unilateral contract is found where there has been an offer that can only be accepted by action.  *Id.* § 1:17.  USA argues that the Commission Agreement is a bilateral contract in that All-Ways promised to solicit freight in consideration of USA Truck's promise to pay a commission on that freight.  All-Ways, however, argues, that the Commission Agreement is a unilateral contract – an offer by USA Truck to pay All-Ways a commission under the terms and conditions set forth in the Commission Agreement – and that All-Ways could accept the offer only by soliciting freight that was then accepted and transported.

the Commission Agreement.[20]

As the Court denies USA's motion for summary judgment as to the Rheem account, the Court likewise denies All-Ways' motion for partial summary judgment in regards to the Rheem account.  All-Ways states it is entitled to its commission on all Rheem freight tendered to USA Logistics and transported for Rheem – regardless of the specific carrier used – from April 5, 2002 (the date USA Truck ceased paying commission to All-Ways on the Rheem account) through October 6, 2005 (the effective date of the cancellation of the Commission Agreement), with said commission totaling $2,966,880.28 (representing 5% of the $59,337,605.61 USA Logistics was paid for transporting Rheem's freight during this period).  Again, however, entitlement to any such commission is dependent upon the meaning to be afforded the Commission Agreement.


2.

The Court now turns to USA's argument that All-Ways' breach of contract claim as to the Grainger account fails as a matter of law because USA Truck had the right to cancel the Commission Agreement.  All-Ways acknowledges that Paragraph 6 of the Commission Agreement gives either USA Truck or All-Ways the right to cancel the Commission Agreement but argues that USA had the right to cancel the agreement only if it were exercising good faith and fair dealing in so doing.  In this regard, All-Ways argues that both Jack Morgan and Patrick Majors of USA assured Mike Anderson of All-Ways on multiple occasions that USA would

---

[20] All-Ways further argues the waiver by acceptance doctrine has no application where, as here, the breach was pointed out and oral complaints were made.  In other words, argues All-Ways, there was no silence of the alleged breach and suit on the alleged breach was brought within the statute of limitations.

never back-solicit All-Ways' customers.  All-Ways states it relied upon these assurances and directed ever increasing amounts of freight to USA Truck for transport only to learn in September 2005 that USA had been in secret negotiations with Grainger and its representatives for many months about going around All-Ways and cancelling their contract and contracting directly with Grainger, causing the loss of millions of dollars in revenue to All-Ways.[21]  Thus, All-Ways argues that rather than exercising good faith and fair dealing, USA "back-solicited" Grainger leading to the cancellation of the Commission Agreement and that this back-solicitation and the secret negotiations leading to the cancellation of the Commission Agreement is actionable because (1) back-solicitation is prohibited by industry custom that is implied in the Commission Agreement; (2) back-solicitation violates USA's express promise in Paragraph 4 of the Commission Agreement to "exercise good faith in deciding all questions concerning [All-Ways'] right to payment of a commission ..."; (3) back-solicitation violates the covenant of good faith and fair dealing that is implied in every contract; and (4) USA promised not to back-solicit All-Ways customers and All-Ways relied on this promise to its detriment.[22]

First, the Court is unable to determine at this time whether any prohibition against back-solicitation is implied in the Commission Agreement.  Course of dealing or usage of trade that explains or supplements a contract is considered competent evidence of the parties' intent and

---

[21] As previously noted, there is testimony suggesting that USA Truck was having secret conversations with Grainger and its representatives about going around All-Ways and cancelling their contract and contracting directly with Grainger.

[22] All-Ways claims that it was the custom in the trucking industry to respect the business relationship that a commission agent had with its shipper customers and to never back-solicit a customer that was brought to a carrier by a commission agent with whom it had contracts.  According to Michael K. Napier, All-Ways' retained expert in the trucking industry, the terms "back-solicitation" or "stealing freight" describe what occurs when either a shipper or carrier, for financial gain, goes around an agent or broker to deal directly with the entity that the agent or broker introduced into the relationship.  Napier stated that "[a]fter taking advantage of the efforts and resources of the agent in bringing the parties together, either [the shipper or the transportation provider] can reduce its cost of doing business and increase its profits if it no longer has to bear the expense associated with creating the relationship," and that "[b]y whatever name it is called, the practice is regarded as unethical and is prohibited by accepted industry's standard."

can become a part of the contract. *Trucker's Exchange, Inc. v. Border City Foods, Inc.*, 67 Ark.App. 231, 236, 998 S.W.2d 434, 437 (1999) (citations omitted).  If the usage was known to both parties or so widespread in the industry that the contract would be presumed to have been made with reference to it, it becomes part of the contract. *Id.*  Whether the prohibition against back-solicitation claimed by All-Ways was known to both parties or so widespread in the industry that the contract would be presumed to have been made with reference to it cannot be resolved on this record.[23]  In addition, whether back-solicitation occurred and whether it violated USA's express promise in Paragraph 4 of the Commission Agreement to "exercise good faith in deciding all questions concerning [All-Ways'] right to payment of a commission ..." cannot be resolved on this record.

Because the Court cannot determine at this time whether back-solicitation occurred, the Court likewise is unable to resolve on this record whether any back-solicitation violated the covenant of good faith and fair dealing that is implied in every contract.  In so finding, the Court rejects USA's argument that All-Ways' breach of implied duty of good faith fails because Arkansas does not recognize a separate cause of action for breach of that duty.  To the contrary, under Arkansas law, every contract contains an implied covenant of good faith and fair dealing. *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 732 (8th Cir. 2003) (citing *TCBY Sys., Inc. v. RSP Co., Inc.*, 33 F.3d 925, 928-29 (8th Cir.1994)).  As is the case with the contract's express terms, the implied covenant is part of the contract and creates contractual obligations that are actionable.  *Id.* (citing *Cantrell-Waind & Assoc. v. Guillaume Motorsports, Inc.*, 62

---

[23] There is presently before the Court a motion to exclude Napier's report, but that motion is not yet ripe.

Ark.App. 66, 71-72, 968 S.W.2d 72, 75 (1988)).[24]  Accordingly, All-Ways' claim for breach of

implied duty of good faith is actionable, and this Court determines that summary judgment in

favor of USA on that question is not appropriate.[25]

Finally, the Court finds that there remain genuine issues of material fact on All-Way's

claim that USA promised not to back-solicit All-Ways customers and that All-Ways relied on

this promise to its detriment.  USA argues that All-Ways' promissory estoppel claim regarding

the Grainger account fails as a matter of law because even assuming USA Truck promised not to

back-solicit Grainger, the undisputed facts show that Grainger wanted to deal directly with USA

Truck and asked for All-Ways to be removed as the agent on the Grainger account.

The Arkansas Supreme Court has adopted the law on promissory estoppel as found in the

Restatement (Second) of Contracts:

> A promise which the promisor should reasonably expect to induce action or
> forbearance on the part of the promisee or a third person and which does induce
> such action or forbearance is binding if injustice can be avoided only by
> enforcement of the promise.  The remedy granted for breach may be limited as
> justice requires.

*Rigsby v. Rigsby*, 356 Ark. 311, 316, 149 S.W.3d 318, 322 (2004) (citing *Van Dyke v. Glover*,

326 Ark. 736, 744-45, 934 S.W.2d 204 (1996)).  The party asserting estoppel must prove it

strictly, there must be certainty to every intent, the facts constituting it must not be taken by

---

[24] USA cites *Country Corner Food & Drug, Inc. v. First State Bank & Trust Co. of Conway*, 332 Ark. 645, 966 S.W.2d 894 (1998), for the proposition that Arkansas does not recognize a separate cause of action for breach of the implied duty of good faith.  The question in *Country Corner*, however, was not whether a cause of action for breach of *contract* could be predicated upon breach of a contract's implied duty of good faith, but whether Arkansas courts should recognize a new *tort* for failure to act in good faith.  The Arkansas Supreme Court "decline[d] to recognize this new tort in Arkansas," *id.* at 332 at 655, 656, 966 S.W.2d at 899, but did not, in so doing, eliminate any action sounding in contract for breach of the implied duty of good faith.

[25] USA also argues that this claim is barred by the three-year statute of limitations found in Ark. Code Ann. § 16-56-105(3).  That section, however, applies to oral contracts and the Commission Agreement in this case is in writing.  Accordingly, it is governed by the five-year statute of limitations found in Ark. Code Ann. § 16-56-111(a).  *See, e.g., Ray & Sons Masonry Contractors, Inc. v. U.S. Fidelity & Guar. Co.*, 353 Ark. 201, 216, 114 S.W.3d 189, 198 (2003).

argument or inference, and nothing can be supplied by amendment.  *Id.*  Further, a party asserting estoppel must prove that in good faith he relied on some act or failure to act by the other party and, in reliance on that act, suffered some detriment.  *Id*. 356 Ark. at 317, 149 S.W.3d at 322.

As discussed previously, All-Ways essentially claims that both Jack Morgan and Patrick Majors of USA Truck assured Mike Anderson of All-Ways on multiple occasions that USA Truck would never back-solicit All-Ways' customers, that All-Ways relied upon these assurances and directed ever increasing amounts of freight to USA Truck for transport, and that All-Ways learned in September 2005 that USA Truck had been in secret negotiations with Grainger for many months leading to a new agreement between USA Truck and Grainger and causing the loss of millions of dollars in revenue to All-Ways.  Claims of promissory estoppel, including whether there was actual reliance and whether it was reasonable, are generally questions for the fact finder, *see Rigsby*, 356 Ark. at 317, 149 S.W.3d at 322, and this Court determines that there remain genuine issues of material fact on this claim.

### 3.

USA next argues that All-Ways' tortious interference with a business expectancy claim relating to the Grainger account fails as a matter of law because All-Ways had no business expectancy, the undisputed facts show USA Truck committed no intentional interference, USA Truck's alleged motive does not support a tortious interference claim because it was not improper, and USA Truck's actions vis-a-vis Grainger were privileged.

The tort of interference with a business expectancy consists of the following elements:

(1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) resulting damages; and (5) the conduct of the interfering party was improper. *Stewart Title Guar. Co. v. American Abstract & Title Co.*, 363 Ark. 530, 540, 215 S.W.3d 596, 601 (2005); *Faulkner v. Arkansas Children's Hosp.*, 347 Ark. 941, 959, 69 S.W.3d 393, 405 (2002).[26]  However, the defendant will not be liable if he shows that his interference was privileged. *Conway Corp. v. Construction Engineers, Inc.*, 300 Ark 225, 233, 782 S.W.2d 36, 40 (1989).  Arkansas recognizes a privilege to compete, and the scope of this privilege is broad:

> In short, it is no tort to beat a business rival to prospective customers.  Thus, in the absence of prohibition by Statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiation behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even to refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.

*Kinco, Inc. v. Schueck Steel, Inc.*, 283 Ark. 72, 77-78, 671 S.W.2d 178, 181 (1984) (quoting W. Prosser, *Law of Torts*, § 130 (3rd ed. 1971)).  *See also Office Machines, Inc. v. Mitchell*, — S.W.3d —, 95 Ark.App. 128, 2006 WL 1172369 *1-2 (2006).

All-Ways states that its tortious interference claim is premised not on the Commission Agreement between All-Ways and USA Truck, but on All-Ways' ten-year history of doing business with Grainger and the business expectancy arising from it which has been disrupted by

---

[26] In determining whether an actor's conduct is improper, this Court considers (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties.  *Stewart Title*, 363 Ark. at 549-50, 215 S.W.3d at 608; *Mason v. Wal-Mart Stores, Inc.*, 333 Ark. 3, 969 S.W.2d 160 (1998).

USA Truck's interference.  Thus, All-Ways states that its loss stems not from the cancellation of

the Commission Agreement, which it acknowledges would not be actionable under a tortious

interference claim, *see Faulkner*, 347 Ark. at 959, 69 S.W.3d at 405 (a party to a contract cannot

be held liable for interfering with the party's own contract), but from USA Truck stealing the

Grainger account.  Considering the evidence referenced previously – that USA Truck was having

secret conversations with Grainger and its representatives about going around All-Ways and

cancelling their contract and contracting directly with Grainger – this Court finds that there

remain genuine issues of material fact concerning the existence of a valid business expectancy

with Grainger, knowledge of the expectancy on the part of USA Truck, intentional and improper

interference by USA Truck inducing or causing a breach or termination of the expectancy, and

resulting damages.[27]  USA Truck asserts its alleged conduct was privileged, but a showing of bad

faith will defeat this privilege and this Court simply is unable to determine on this record that no

bad faith occurred.[28]

4.

Finally, USA claims All-Ways cannot support a claim for punitive damages.  USA argues

that Arkansas law does not allow punitive damages for breach of contract, absent extraordinary

---

[27] USA argues that All-Ways' claim of a business expectancy was subject to a "contingency" in the Commission Agreement, namely Paragraph 6, which gave USA Truck the right to cancel the Commission Agreement at any time based on 30-days written notice.  *See Windsong Enterprises, Inc. v. Upton*, 366 Ark. 23, – S.W.3d – , 2006 WL 728405 *3 (Ark. 2006) (an expectancy subject to a contingency, which occurred, is not tortious interference with business expectancy).  Here, however, All-Ways' tortious interference claim is not premised on the Commission Agreement.

[28] To the extent All-Ways is claiming that USA Truck interfered with its ability to do business with Grainger generally or its ability to make commissions on Grainger freight hauled by other carriers, All-Ways acknowledges that after USA Truck cancelled the Commission Agreement, All-Ways continued to solicit freight from Grainger for Paschal Truck Lines – another carrier – during the year 2005 while the Commission Agreement with USA Truck was in place and continued to do so after USA Truck cancelled its Commission Agreement with All-Ways.

circumstances which All-Ways has not pleaded, *see L.L. Cole & Son, Inc. v. Hickman*, 282 Ark.

6, 665 S.W.2d 278 (1984) (holding that, ordinarily, punitive damages for breach of contract are

not allowed), and that without All-Ways' tortious interference and defamation claims, there is no

basis for punitive damages.  The Court, however, has determined that there remain genuine

issues of material fact on All-Ways' tortious interference claim and will, therefore, deny at this

time USA's motion for summary judgment on this point (although the Court will revisit the issue

prior to any submission of the case to the jury).


5.

The Court now turns to All-Way's motion for summary judgment on USA's

counterclaim.  As previously noted, USA's counterclaim alleges that after All-Ways became

USA Truck's Commission Agent on the Grainger account, All-Ways was solely responsible for

communicating with Grainger about USA Truck's transportation services and that pursuant to

the parties' agreement, All-Ways had an obligation to insure that USA Truck's rates were

submitted to and approved by Grainger.  USA states the parties' agreement was based on an

"oral or written" contract whereby All-Ways had agreed to be the middle-man in charge of

getting rates approved.  USA claims All-Ways breached this duty, thereby enriching itself by

receiving a 5% commission on inflated rates, and that as a result of that breach, Grainger made

an overcharge claim against USA Truck for approximately $700,000.  USA's counterclaim

asserts causes of action for negligence, breach of fiduciary duty, and breach of agency contract.

All-Ways argues it is entitled to summary judgment on USA's counterclaim on grounds

that (1) negligent breach of contract is not a tort under Arkansas law, (2) no facts are pled that

would establish a fiduciary relationship under Arkansas law, and (3) USA has failed to plead

sufficient facts upon which to find All-Ways had a duty to "secure approval for the new rates."

Certainly USA's negligence claim is not free from doubt.  While it is true that legitimate

tort claims can arise out of contractual relationships in some situations, *see Lehman Properties,*

*Ltd. Partnership v. BB & B Const. Co., Inc.*, 81 Ark.App. 104, 110, 98 S.W.3d 470, 474 (2003),

unless the conduct involves a foreseeable, unreasonable risk of harm to the plaintiff's interests, a

breach of contract is generally not treated as a tort if it consists merely of a failure to act

(nonfeasance).  *Id.*  *See also Westark Specialties, Inc. v. Stouffer Family Ltd., Partnership*, 310

Ark. 225, 232-33, 836 S.W.2d 354, 357-58 (1992).  Here, USA seemingly is alleging primarily a

mere failure to get rates approved (nonfeasance) as opposed to conduct involving a foreseeable,

unreasonable risk of harm to its interests.

USA's breach of fiduciary duty claim is similarly questionable.  Breach of fiduciary duty

involves betrayal of a trust and benefit by the dominant party at the expense of one under his

influence.  *Cole v. Laws*, 349 Ark. 177, 185, 76 S.W.3d 878, 883 (2002).  A fiduciary may be

held liable for conduct that does not meet the requisite standards of fair dealing, good faith,

honesty, and loyalty.  *Id.*  The guiding principle of the fiduciary relationship is that self-dealing,

absent the consent of the other party to the relationship, is strictly prohibited.  *Id.*  The viability

of this claim is questionable given the nature of All-Ways' and USA Truck's relations, including

that All-Ways does not appear to have been the "dominant" party.

USA's breach of agency contract claim presents a slightly closer question.  All-Ways

argues that Paragraph 2 of the Commission Agreement, which provides that All-Ways "will be

an independent contractor with control over the manner, means and method of freight

solicitation," establishes that All-Ways was an independent contractor, not an agent, of USA Truck and that there thus could be no breach of "agency" contract regarding approval of rates.

The two essential elements of an agency relationship are (1) that an agent have the authority to act for the principal and (2) that the agent act on the principal's behalf and be subject to the principal's control. *Taylor v. Gill*, 326 Ark. 1040, 1043, 934 S.W.2d 919, 921 (1996). An agency may be implied from the conduct of the parties even absent an express agreement. *Id*.

USA argues that Paragraph 2 of the Commission Agreement simply addresses the solicitation of freight and does not address who is responsible for submitting USA Truck's rates to shippers, and that All-Ways agreed to and for several years did act as USA Truck's agent for submitting and getting rates approved. Although All-Ways argues that USA has failed to plead sufficient facts upon which to find All-Ways had a duty to "secure approval for the new rates," there is conflicting testimony on this point and this Court finds that there remain genuine issues of material fact on USA's breach of agency contract claim. That being so, this Court will deny All-Ways' motion for summary judgment on USA's counterclaim in its entirety and will allow the evidence to develop at trial before ruling conclusively on the theory, if any, USA's claim that All-Ways agreed to be in charge of getting the rates approved will be submitted to the jury.

All-Ways also seeks judgment for breach of contract for non-payment of sums due under the Commission Agreement for freight transported for Grainger. In this respect, USA acknowledges it withheld payment as a set-off against an amount it claims as damages in its counterclaim regarding the rate difference that was not approved by Grainger. Depending on the

resolution of certain issues in this action, All-Ways may be entitled to the amount so withheld.[29]


III.

For the foregoing reasons, the Court denies as moot All-Ways' motion to dismiss USA's counterclaim [doc.#37], denies All-Ways' motion for summary judgment on USA's counterclaim [doc.#39], denies All-Way's motion for partial summary judgment in regards to the Rheem account [doc.#42], and denies USA's motion for summary judgment [doc.#46].


IT IS SO ORDERED this 2nd day of July, 2007.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[29] Considering the present record, All-Ways motion for partial summary judgment on the Rheem account and its motion for summary judgment on USA's counterclaim are far from weak and the Court cannot foreclose the possibility that at least some of the arguments presented in those motions may ultimately prevail.